McKEAGUE, Circuit Judge,
dissenting.
DISSENT
The sheer length of the majority’s opinion, to resolve the single jurisdictional issue before us, betrays its error. Under governing law, the question presented is really quite simple. Not content with the simple answer, the majority strives mightily to justify a different approach. In the process, we contribute to a judicial remaking of the law that is authorized neither by Congress nor the Supreme Court. Because the majority’s decision impinges on tribal sovereignty, encroaches on Congress’s plenary and exclusive authority over Indian affairs, conflicts with Supreme Court precedent, and unwisely creates a circuit split, I respectfully dissent.
I
All agree that Indian tribes are sovereign political entities that retain their sovereignty. All agree that Congress has plenary authority over Indian affairs and that tribal sovereignty is subject to complete defeasance by Congress. All agree that federal law will not be deemed to limit tribal sovereignty absent evidence of congressional intent to do so. All agree that the National Labor Relations Act, the exclusive basis for the National Labor Relations Board’s exercise of jurisdiction in this case, is silent as to Indian tribes. The Board’s order, prohibiting the Little River Band of Ottawa Indians from enforcing its Fair Employment Practices Code, clearly impinges on an exercise of the Band’s tribal sovereignty. No one denies that the record is devoid of evidence of congressional intent, express or implied, to authorize such an interference with tribal sovereignty. The proper inference to be drawn from Congress’s silence, I submit, is that tribal sovereignty is preserved and the Board’s incursion is unauthorized by law.
The majority, however, approves the Board’s adoption of a different way of construing congressional silence, a way that has never been approved by the Supreme Court or applied in any circuit to justify federal intrusion upon tribal sovereignty under the NLRA. In my opinion, under current governing law, the Board’s exercise of jurisdiction is simply beyond its authority, an arrogation of power that Congress has not granted. Hence, the Board’s action not only impinges imper-missibly on tribal sovereignty, but also encroaches on Congress’s exclusive and plenary authority over Indian affairs. By failing to so hold, we neglect our duty to preserve the constitutionally mandated *557 balance of power among the coordinate branches of government,
II
A. The NLRB’s Evolving Approach
The majority recognizes that our review of the Board’s assessment of its jurisdiction is de novo. Chevron deference plays no role. The majority also acknowledges that the NLRA is silent as to Indian tribes and that the Board’s exercise of jurisdiction in this case is premised fundamentally, not on any other act of Congress or governing judicial decision, but on principles effectively announced in its own prior decision in San Manuel Indian Bingo and Casino, 341 NLRB 1055 (2004), aff'd on alternate grounds, 475 F.3d 1306 (D.C.Cir.2007). Until just prior to its San Manuel decision, the NLRB had consistently held that Indian tribes and their enterprises were exempt from regulation under the NLRA. Id. at 1055. The NLRB’s earlier approach was based on respect for the traditional view that Indian tribes are generally free from federal intervention “unless Congress has specifically provided to the contrary.” Id. at 1059. Indeed, the NLRB’s earlier precedents were entirely consistent with the established jurisprudence. See Oklahoma Tax Comm’n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (“Indian tribes are ‘domestic dependent nations’ that exercise inherent sovereign authority over their members and territories.”); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 60, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (“[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent.”); United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (recognizing that sovereignty retained by tribes is subject to complete defeasance by Congress, but that “until Congress acts, the tribes retain their existing sovereign powers”). Indeed, the Supreme Court recently reaffirmed the “enduring principle of Indian law” that tribal sovereignty is retained unless and until Congress clearly indicates intent to limit it. Michigan v. Bay Mills Indian Community, — U.S. —, 134 S.Ct. 2024, 2030-32, 188 L.Ed.2d 1071 (2014).
So what changed to justify the NLRB’s new approach? Congress has not amended the NLRA or in any other way signaled its intent to subject Indian tribes to NLRB regulation. Nor has the Supreme Court recognized any such implicit intent. The NLRB “adopted a new approach” and “established a new standard” based on its recognition that some courts had begun to apply other generally applicable federal laws to Indian tribes notwithstanding Congress’s silence. San Manuel, 341 NLRB at 1055, 1057, 1059. These courts, the NLRB observed, found support for this new approach in a single statement in a 1960 Supreme Court opinion, Federal Power Comm’n v. Tuscarora Indian Nation, 362 U.S. 99, 116, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960): “fl]t is now well-settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests.” The statement buttressed the Court’s holding, but was not essential to it. While the Tuscarora statement has blossomed into a “doctrine” in some courts in relation to some federal laws, closer inspection of the Tuscarora opinion reveals that the statement is in the nature of dictum and entitled to little precedential weight. In reality, the Tuscarora “doctrine,” here deemed to grant the NLRB “discretionary jurisdiction,” is used to fashion a house of cards built on a fanciful *558 foundation with a cornerstone no more fixed and sure than a wild card.
In Tnscarora, the Federal Power Act, “a complete and comprehensive plan” which by its terms addressed “tribal lands embraced within Indian reservations,” was held to sufficiently express congressional intent to authorize an exercise of eminent domain over land owned by individual Indians or even by a tribe if the land was not “within a reservation.” Id. at 118, 80 S.Ct. 543. The Tnscarora Court did not have to define the scope of Federal Power Commission jurisdiction in the face of congressional silence; it declared and enforced Congress’s manifest intent. Moreover, inasmuch as the Indian—owned land at issue in Tnscarora was not within the reservation, no interest of tribal sovereignty was implicated, but only tribal proprietary interests. And finally, the notion that the Tnscarora statement, independent of the Court’s actual holding, has any coin-trolling or persuasive weight is negated by subsequent Supreme Court rulings applying traditional Indian law principles and upholding tribal sovereignty in the face of generally applicable federal laws—without even mentioning Tuscarora. See Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 18, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) (tribal sovereignty upheld in the face of assertion of the generally applicable federal diversity statute because no indication of congressional intent to impair tribal sovereignty); Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 149, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (congressional silence deemed insufficient to justify preemption of tribal sovereign power to tax). Indeed, in Bay Mills, the Court’s most recent treatment of tribal sovereignty, Tnscarora played absolutely no role as the Court adhered to the same traditional Indian law principles in holding Michigan’s attempt to restrain casino gaming barred by tribal sovereign immunity, a core aspect of tribal sovereignty. Bay Mills, 134 S.Ct. at 2030-39.
The Tnscarora statement, properly understood, thus offers little authoritative guidance on the present jurisdictional question. Yet, the NLRB noted in San Manuel that the Tnscarora “seed” had germinated in Donovan v. Coeur d A'lene Tribal Farm, 751 F.2d 1113 (9th Cir.1985), in relation to the Occupational Safety and Health Act. In Coeur d’Alene, the Ninth Circuit recognized that the Tnscarora statement was dictum, but nonetheless applied it to (1) reject the proposition that Indian tribes are subject only to those laws expressly made applicable to them; and (2) hold that tribes and their members are subject to generally applicable laws unless expressly excluded. Id. at 1115-16. In one fell swoop, the Coeur d’Alene court thus used the twenty-five year old Tuscarora statement to reverse the established presumption arising from congressional silence. According to the Coeur d’Alene innovation, congressional silence in a generally applicable law would now give rise to a reversed presumption; the law applies to Indian tribes unless one of three exceptions is shown to apply.
Seventeen years later, the NLRB first invoked this Tuscarorar-Coeur d’Alene approach to justify its assertion of jurisdiction to bar enforcement of a tribal right-to-work law in NLRB v. Pueblo of San Juan, 276 F.3d 1186 (10th Cir.2002) (en banc). In Pueblo of San Juan, the NLRB advanced all the same arguments that are presented here. In a comprehensive opinion, the Tenth Circuit, sitting en banc, upheld traditional Indian law principles; required the NLRB to present evidence of Congress’s intent to divest tribal power through the NLRA; and, finding none, held the tribal law was not preempted by the NLRA. Id. at 1190-98.
*559 In response to the NLRB’s reliance on Tmcarora, the Tenth Circuit refused to read the Tmcarora statement in isolation. It refused to give the statement independent significance apart from the controversy actually decided in Tmcarora. The court recognized that the application of the Federal Power Act in Tmcarora only impacted the tribe’s proprietary interests as landowner; it did not impair tribal sovereign authority to govern, as was clearly implicated by the Pueblo of San Juan’s labor regulation. Citing the Supreme Court’s ruling in Merrion, 455 U.S. at 137, 102 S.Ct. 894, the Tenth Circuit recognized that enactment of Pueblo’s right-to-work ordinance was in furtherance of its strong interest in regulating economic activity involving its own members within its own territory, “a fundamental attribute of sovereignty” and “a necessary instrument of self-government and territorial management.” Pueblo of San Juan, 276 F.3d at 1200. The Tenth Circuit reiterated and enforced the well-established traditional Indian law principles, holding that Tuscarora may not be applied by the NLRB to divest a tribe of its sovereign authority without clear indications of congressional intent to do so. Id. at 1199-1200.
In 2002, the Tenth Circuit thus squarely rejected the NLRB’s innovative attempt to overrule its own prior precedents based on dictum appearing in a 1960 Supreme Court opinion. Undeterred, the NLRB tried again in San Manuel, 341 NLRB 1055. Employing the Tuscarora-Coeur d’Alene standard, the NLRB again posited that, because the NLRA is silent and does not ■preclude exercise of jurisdiction, it follows that the NLRB has discretionary authority to balance interests of Indian sovereignty with interests of federal labor policy on a case-by-case basis. Id. at 1062-63. Again, the NLRB, in a tortured twist of logic, reasoned that because Congress, the branch of federal government with exclusive and plenary authority to divest Indian tribes of their retained sovereign powers, said nothing about Indian tribes in the NLRA, Congress must have meant to grant the NLRB discretionary authority to intrude upon Indian sovereignty as it sees fit. Extraordinary. In overruling its own prior precedents, the NLRB barely mentioned the Tenth Circuit’s contrary analysis in Pueblo of San Juan, the only court to have addressed (and definitively rejected) the NLRB’s new approach. The NLRB summarily dismissed Pueblo of San Juan in a footnote, characterizing it as “the opinion of a single court of appeals.” Id. at 1060 n. 16.[1]
The NLRB’s San Manuel decision was affirmed on appeal; but its rationale was not. San Manuel Indian Bingo and Casino v. NLRB, 475 F.3d 1306 (D.C.Cir.2007). The D.C. Circuit recognized the tension between the Tuscarora statement, which it characterized as “possibly dictum,” and traditional Indian law principles prohibiting interference with tribal sovereignty except upon clear expression of congressional intent. Id. at 1311. The court expressly refrained from endorsing the NLRB’s Tuscarora-Coeur d’Alene approach. Yet, despite congressional silence, the D.C. Circuit allowed the NLRB’s exercise of jurisdiction to stand, reasoning that the tribal interests impacted were “primarily commercial” and the impact on tribal sover *560 eignty would be “unpredictable, but probably modest.” Id. at 1315.[2]
The D.C. Circuit thus steered a middle course, departing from established principles of Indian law, but refraining from adopting the Tuscarora-Coeur d’Alene approach. In doing so, the D.C. Circuit did not try to reconcile its ruling with, or distinguish it from, the Tenth Circuit’s Pueblo of San Juan ruling. In fact, it conspicuously avoided any reference to the Tenth Circuit’s analysis. The NLRB thus obtained a favorable result, but the D.C. Circuit’s San Manuel decision falls far short of vindication for the NLRB. Far from establishing a new way of understanding the reach of the NLRA in relation to Indian tribes, the D.C. Circuit’s ruling is distinctly pragmatic and fact-specific.[3]
B. The Board’s Present Assertion of Jurisdiction
These are the relevant judicial precursors to the Board’s present assertion of jurisdiction under the NLRA. Relying on the “Tuscarora doctrine” and the new “discretionary jurisdictional standard” it adopted in its San Manuel decision, the Board exercised its discretion to hold the Little River Band’s Fair Employment Practices Code preempted by the NLRA. Little River Band of Ottawa, Indians Tribal Gov’t, 359 NLRB No. 84 at *4 (2013). The Board concluded, in the discharge of its newly created interest-balancing duties, that the FEP Code need not be respected as an exercise of tribal sovereign authority because the Code governs, among other things, employment relations at a commercial enterprise operated by the Band, the Little River Casino Resort. Although the Resort is located and operated entirely within the reservation, non-Indians are employed there and non-Indians are customers there, and the Resort’s operation affects interstate commerce. Id. at *4-6. These factors were deemed sufficient to justify preemption by the NLRA and assertion of jurisdiction by the NLRB.
The Board rejected the Band’s reliance on Pueblo of San Juan in challenging its assertion of jurisdiction. The Board characterized the Tenth Circuit’s decision as narrow and inapposite because it did not *561 involve a federal law of general applicability—even though it involved application of the NLRB’s assertion of the very same NLRA to preempt a closely analogous tribal employment relations law. Id. at *5. In further explanation, the Board also noted its prerogative, pursuant to its “nonac-quiescence policy,” to respectfully disagree with the Tenth Circuit. Id. at *5 n. 8.
In my opinion, the analysis employed by the Tenth Circuit in Pueblo of San Juan is true to the governing law and should be adopted in the Sixth Circuit as well. It is not necessary to recapitulate that reasoning here. Neither the Board nor the majority has identified error in the Tenth Circuit’s analysis. Tellingly, the Board has not asked us to apply the D.C. Circuit’s San Manuel hybrid approach in this case. Rather, it continues to pursue judicial approval of its new Tuscamra-Coeur d’Alene approach. The Tenth Circuit considered it and definitively rejected it. The D.C. Circuit considered it and demurred. Today, in the Sixth Circuit, the Board finds a sympathetic ear ... notwithstanding Congress’s silence, notwithstanding the suspect origins of the Tuscarora-Coeur d'Alene “doctrine,” and notwithstanding the lack of any persuasive reason to depart from the traditional Indian law principles that the Supreme Court has consistently applied. This sympathy seems particularly Ill-timed in view of the Supreme Court’s recent reaffirmation of the traditional principles in Bay Mills.
C. Particular Objections
But before considering the significance of Bay Mills, several elements of the majority’s approval of the Board’s innovation deserve particular mention. First, my colleagues purport to find legitimacy for the Board’s new approach in two Supreme Court opinions that are said to “anticipate” this evolution in traditional Indian law principles. The first of these is the Tuscarora opinion itself. Tuscarora, of course, speaks for itself. The grounds for my conclusion that some courts, and now the Board, have read much more into the Tuscarora statement than was ever intended are adequately stated above. Not least of these is the fact that the Tuscarora statement (much less the Tuscarora “doctrine”) has been ignored by the Supreme Court ever since. Moreover, even those courts that have viewed the statement as significant have recognized it to be in the nature of dictum. Lastly, the holding in Tuscarora, on the reach of the Federal Power Act: (a) did not result in any impairment of tribal sovereignty; and (b) hinged not on the generally-applicable nature of the Act, but on the Court’s discernment of Congress’s manifest intent. The holding of Tuscarora, then, is entirely consonant with traditional Indian law principles. The Tuscarora holding gave effect to the clear indications of congressional intent, just as we should here ... to the extent there are any.
The majority also cites Merrion as signaling the Supreme Court’s willingness to find implicit divestiture of tribal sovereignty in a federal law of general applicability. Majority Op. at 547 n. 1. Yet, the Merrion Court held that just such a generally applicable law, the Natural Gas Policy Act, did not effect a divestiture precisely because the text and legislative history did not evidence such a congressional intent. Merrion, 455 U.S. at 152, 102 S.Ct. 894. Merrion, too, thus confirms traditional Indian law principles: absent some clear indication from Congress, a federal law will not be deemed to implicitly impair tribal sovereignty simply because it is generally applicable.
Nonetheless, my colleagues note that the FEP Code affects non-Indians who obtain employment within the Band’s trust *562 lands. Without denying that the FEP Code is a generally applicable and comprehensive regulatory scheme in exercise of the Band’s tribal sovereignty, the majority prefers to characterize the Code narrowly (and disparagingly) as a mere “regulation of activities of non-members.” Hence, the majority opinion cites several Supreme Court decisions that recognized limitations on tribal sovereign authority to regulate non-Indians even in the absence of congressional action or indications of congressional intent to divest tribal power. Majority Op. at 544-46. The cited decisions are inapposite.
In Montana v. United States, 450 U.S. 544, 564-66, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), for instance, the Court held not that tribal sovereign power had been implicitly divested by Congress, but that the tribe did not have authority in the first place via “retained inherent sovereignty” to regulate hunting and fishing by nonmembers of the tribe on lands no longer owned by the tribe—unless the nonmembers entered consensual relationships with the tribe through commercial dealing, contracts, leases, or other arrangements; or unless the conduct of nonmembers on fee lands within the reservation threatened or had some direct effect on the political integrity, economic security, or health and welfare of the tribe. To similar effect are the decisions in Plains Commerce Bank v. Long Family Land and Cattle Co., Inc., 554 U.S. 316, 341, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008), and Nevada v. Hicks, 533 U.S. 353, 358-60, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). That is, all three cases, Montana, Plains Commerce and Hicks, deal with the bounds of retained inherent sovereignty, not the implicit divestiture thereof.
Here, in contrast to those cases, there is no real dispute that the Little River Band’s enactment of the FEP Code, regulating employment relations between the tribe and tribal members and nonmembers alike, on tribal lands within the Tribal Government’s jurisdiction, is a bona fide exercise of inherent sovereign authority. See Merrion, 455 U.S. at 137, 102 S.Ct. 894 (recognizing that a tribe’s authority to regulate economic activity within its territory is among its retained sovereign powers). To the extent that nonmembers are subject to regulation under the FEP Code, the regulation flows directly from the Band’s inherent sovereign interests in tribal self-government and management of internal relations. See Plains Commerce, 554 U.S. at 335, 128 S.Ct. 2709; Montana, 450 U.S. at 564, 101 S.Ct. 1245. In the language of Hicks, the FEP Code is a “[tjribal assertion of regulatory authority over nonmembers ... connected to that right of the Indians to make their own laws and be governed by them.” Hicks, 533 U.S. at 361, 121 S.Ct. 2304. Yes, the Band’s interest in regulating nonmembers may be weaker, but the nonmembers that come within the FEP Code’s regulation have entered into consensual contractual (employment) relationships with the Band and are therefore properly subject to the Code’s requirements. See Montana, 450 U.S. at 565, 101 S.Ct. 1245.
While these decisions address questions regarding the scope of retained inherent tribal sovereignty, the instant appeal, as the majority recognizes, presents a different question. Majority Op. at 543-44. The Band’s authority to enact the FEP Code is unquestioned. We must instead decide whether, under traditional Indian law principles, the Board has authority, per its “new approach,” to interfere with the Band’s legitimate exercise of tribal sovereignty, and specifically, whether there are clear indications that Congress has authorized such interference, explicitly or implicitly. Because there are no such clear indications, as the majority must eon- *563 cede, we should stay the Board’s overreaching hand—unless and until Congress acts or the Supreme Court alters the governing law. See Bay Mills, 134 S.Ct. at 2037 (recognizing “it is fundamentally Congress’s job, not ours,” to determine the nature and extent of tribal sovereignty).
D. Teaching of Bay Mills
Indeed, Bay Mills clearly illustrates the Court’s steadfast deference to Congress’s plenary and exclusive role in defining tribal sovereignty: “Although Congress has plenary authority over tribes, courts will not lightly assume that Congress intends to undermine Indian self-government.” Bay Mills, 134 S.Ct. at 2031-32. The Court enforced the “enduring principle of Indian law” requiring that Congress “unequivocally express” its intent to limit tribal sovereignty. Id. Thus, where Congress had expressly abrogated tribal immunity from suit for illegal gaming on Indian lands, the Court refused to expand the abrogation to allow suit for illegal gaming outside Indian country, even though the resulting anomaly was arguably nonsensical. Id. at 2033-34. The Court reasoned that “Congress should make the call whether to curtail a tribe’s immunity for off-reservation commercial conduct—and the Court should accept Congress’s judgment.” Id. at 2038.
Moreover, the Court expressly declined to draw the distinction, here urged by the Board as well, between actions of tribal self-governance and commercial activities of the tribe. The court gave one “simple reason: because it is fundamentally Congress’s job, not ours.” Id. at 2037. Congress, the Court observed, “has the greater capacity to weigh and accommodate the competing policy concerns.” Id. at 2037-38 (internal quotation marks omitted).
Bay Mills is not controlling, but it highlights the incorrectness of the majority’s analysis. A couple of particular examples further illustrate the point. One sentence that typifies the majority’s opinion reads as follows: “The tribes’ retained sovereignty reaches only that power needed to control internal relations, preserve their own unique customs and social order, and prescribe and enforce rules of conduct for their own members.” Majority Op. at 550 (internal alterations omitted). The statement simply cannot be reconciled with Bay Mills, for we know that a tribe’s sovereignty encompasses all historic “core aspects” of its sovereignty—more than just controlling internal relations (and including immunity from suit). Bay Mills, 134 S.Ct. at 2030; see also Kiowa Tribe of Oklahoma v. Mfg. Technologies, Inc., 523 U.S. 751, 758, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998) (“[Tjribal [sovereignty] extends beyond what is needed to safeguard tribal self-governance.”). Or consider another sentence from the majority opinion: “[W]hen a tribal government goes beyond matters of internal self-governance and enters into an off-reservation business transaction with non-Indians, its claim of sovereignty is at its weakest.” Majority Op. at 544 (internal citations omitted). But such a transaction in Bay Mills did not weaken the tribe’s sovereignty whatsoever; the Supreme Court required a clear congressional statement to abrogate the tribe’s immunity.
The majority opinion reads as if Bay Mills doesn’t exist. It relies on Montana as “charting] the contemporary law of implicit divestiture of inherent tribal sovereignty.” Id. at 545 (emphasis added). Yet, as explained above, Montana is not a divestiture case at all; Bay Mills is. And in the debate between the justices in Bay Mills, thirty-three years after Montana, we find a truly contemporary clarification of Indian sovereignty. The dissent in Bay Mills would have applied a “modest scope *564 of tribal sovereignty ... limited only to Svhat is necessary to protect tribal self-government or to control internal relations.’ ” Bay Mills, 134 S.Ct. at 2048 (Thomas, J., dissenting) (quoting Montana, 450 U.S. at 564, 101 S.Ct. 1245). That sounds like the majority opinion. But the Court rejected that modest scope of tribal sovereignty in favor of a more robust one. Bay Mills, 134 S.Ct. at 2031-32. Even though neither the Court nor any party “suggested that immunity from the isolated suits that may arise out of extraterritorial commercial dealings is somehow fundamental to protecting tribal government or regulating a tribe’s internal affairs,” id. at 2048 (Thomas, J., dissenting), the Court upheld the tribe’s sovereignty.
In sum, the majority’s sympathy for the Board’s assertion of jurisdiction in this case not only finds precious little support in, but is affirmatively undercut by, the Supreme Court’s most recent pronouncements on Indian sovereignty.
Ill
To be clear, my difference with the majority opinion has nothing to do with the wisdom of applying the NLRA’s provisions to employment relations on Indian lands. Such a matter of policy is within Congress’s exclusive and plenary authority. There simply is no indication that the NLRB’s new approach is harmonious with congressional intent. In fact, the best indications are actually to the contrary.
Congress has been committed to a policy of promoting tribal self-government by encouraging tribal self-sufficiency and economic development. California v. Cabazon Band of Mission Indians, 480 U.S. 202, 216, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334-35, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983). The Band’s FEP Code, regulating labor and employment relations within its territory, is an exercise of sovereign authority entirely consonant with congressional policy. A majority of the labor and employment relations governed by the FEP Code apply to operations at the Little River Casino Resort. The Resort was established under the Indian Gaming Regulatory Act, effectuating Congress’s express purpose of “promoting tribal economic development, self-sufficiency, and strong tribal governments.” 25 U.S.C. § 2702(1). This purpose is consonant with the Supreme Court’s recognition that Indian gaming is an instrument of tribal sovereignty not unlike the taxing power, because it provides revenues for the operation of tribal government and provision of essential tribal services. Cabazon Band, 480 U.S. at 218-20, 107 S.Ct. 1083. See also Bay Mills, 134 S.Ct. at 2043 (Sotomayor, J., concurring) (recognizing that “tribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate from the Tribes’ core governmental functions” because “tribal business operations are critical to the goals of tribal self-sufficiency”).
There are thus manifest reasons to conclude that Congress’s silence regarding application of the NLRA to Indian tribes should not be read as implicitly authorizing divestment of tribal sovereignty. At the same time, there are sound reasons to abide by traditional Indian law principles and view Congress’s silence as reflective of intent to uphold tribal sovereignty. As the Supreme Court recently observed, “Congress of course may always change its mind—and we would readily defer to that new decision.” Bay Mills, 134 S.Ct. at 2039. But where Congress has had the opportunity to reflect on an issue of tribal sovereignty and declined to change settled law, proper respect for its plenary authority cautions against viewing Congress’s si- *565 fence as anything other than continuing approval of settled law. Id.
Disregarding these reasons, and armed with no legal support other than the “new approach” it adopted in San Manuel in 2004, the Board insists that it now has “discretionary jurisdiction” under the NLRA. Under governing law, the Board’s assertion of jurisdiction, wise or not, is plainly beyond its authority. The majority having identified no persuasive reason for complicity in the Board’s usurpation of Congress’s authority, I must dissent.
IV
How does one statement of dictum, in a 1960 Supreme Court opinion, grow into a “doctrine,” contrary to traditional principles of Indian law, yet justifying federal intrusion upon tribal sovereignty in 2015? It starts with litigants urging lower courts to adopt the dictum as a guiding rationale for extending the reach of federal law. Once one court agrees and, in the name of reasonableness, invents its own exceptions, other courts find it convenient to follow suit. Why not? It’s a handy standard, and other courts are using it without disastrous consequences. And so it begins. Then the alert federal agency, sensing a shift in momentum and judicial receptivity to expansion of regulatory power, seizes the opportunity and completely inverts its preexisting approach. Now, despite congressional silence, the courts and executive are playing in unison. Never mind one setback in the Tenth Circuit; the dictum is now become a doctrine.
But it’s also a house of cards. It should—and does—collapse when we notice what’s inexplicably overlooked in the fifty-five years of adding card upon card to “a thing said in passing.” Not only has the Supreme Court conspicuously refrained from approving it, but the “doctrine” is exactly 180-degrees backward. It presumes intent to limit tribal sovereignty when Congress is silent, even though congressional silence traditionally, and still, has been deemed insufficient to authorize limitation. Bay Mills, 134 S.Ct. at 2031-32. Our adding to, rather than blowing down, the house of cards at once usurps Congress’s power, ignores Supreme Court precedent, creates a needless circuit split and, not least of all, impermissibly intrudes on tribal sovereignty. I respectfully dissent.

. Secondarily, the NLRB suggested Pueblo of San Juan is factually distinguishable in that it implicated an exercise of tribal sovereign power; whereas in San Manuel, the NLRB asserted jurisdiction only to regulate commercial activities of the tribe in its proprietary capacity. 341 NLRB at 1060 n. 16. As pointed out by the dissent in San Manuel, this distinction does not withstand scrutiny. In both cases, the NLRB asserted jurisdiction under the NLRA to preempt analogous tribal labor relations ordinances. Id. at 1067.

. The court reached this conclusion by focusing on the specific dispute at issue, competition between two unions to organize employees at a casino owned and operated by the tribe. The NLRB had ordered the tribe to grant equal access to both unions. Even though the court noted that employment relations at the casino were subject to a tribal labor ordinance, which represented an act of governance, the court held the ordinance was only “ancillary” and “secondary” to the commercial undertaking at issue. The D.C. Circuit thus focused on the tribe’s proprietary interest as owner of a commercial enterprise, rather than its status as sovereign of the territory where the casino was located.

. The facts of this case are materially distinguishable from those presented in San Manuel. The nature of the NLRB’s instant intrusion—not simply resolving a particular dispute between unions at a casino, but asserting the NLRA’s preemptive effect to bar enforcement of numerous provisions of the Band’s comprehensive FEP Code indefinitely—threatens a much more substantial impairment of the Band's sovereign authority. See also Pueblo of San Juan, 276 F.3d at 1200 (recognizing that NLRA preemption of a tribe's legislative enactment regulating labor and employment relations within the reservation is a unique threat to “a fundamental attribute of sovereignty and a necessary instrument of self-government and territorial management”). Moreover, the D.C. Circuit's notion that tribal interests of a commercial nature warrant only diminished tribal-sovereignty respect has been squarely rejected by the Supreme Court in Bay Mills, 134 S.Ct. at 2039 (reasoning that any such limitation of tribal sovereignty in relation to commercial activity is not for the courts to decide, but is a matter for Congress’s policy judgment).