**NATIONAL LABOR RELATIONS BOARD, Applicant,**

v.

**FORTUNE BAY RESORT CASINO, Respondent.**

**MISC. No. 08–0065 (JRT/JJG).**

United States District Court, D. Minnesota.

Feb. 25, 2010.

Joseph H. Bornong, National Labor Relations Board, Minneapolis, MN, for applicant.

Henry M. Buffalo, Jr., Jessica Intermill, Joseph F. Halloran, Mark A. Anderson, William A. Szotkowski, Jacobson, Buffalo, Magnuson, Anderson & Hogan, Saint Paul, MN, for respondent.

## MEMORANDUM OPINION AND ORDER ADOPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

JOHN R. TUNHEIM, District Judge.

On December 9, 2008, applicant National Labor Relations Board (the "Board") filed an Application for an Order Requiring Obedience to Subpoena Duces Tecum. (Docket No. 1.) In a Report and Recommendation, United States Magistrate Judge Jeanne J. Graham recommended that the Court grant the Board's application. (Report & Recommendation at 19, Docket No. 14.) The case is before the Court on respondent Fortune Bay Resort Casino's ("Fortune Bay") objections to the Report and Recommendation. (Docket No. 15.) After reviewing *de novo* those portions of the Report and Recommendation to which Fortune Bay objected, 28 U.S.C. § 636(b)(1)(C); D. Minn. LR 72.2, the Court overrules the objections and adopts the Report and Recommendation for the reasons set forth below.

## BACKGROUND

Fortune Bay is a wholly owned and managed governmental entity of the Bois Forte Band of Chippewa Indians (the "Band"), which is a federally recognized Indian tribe. (Response to Order to Show Cause at 18, Docket No. 7.) Fortune Bay operates a hotel, resort, and casino on the Band's Lake Vermillion Reservation pursuant to a tribal gaming ordinance and license issued by the Bois Forte Reservation Tribal Council. (*Id.* at 3.) Fortune Bay employs approximately 450 people, one-third of whom are Native Americans, and of the Native Americans employed, eighty-two percent are Band members. (*Id.* at 19.) Customers of the Fortune Bay Resort Casino include both members and nonmembers. (Board's Mem. in Supp. at 3, Docket No. 2.)

In 2007 the United Steelworkers Union (the "Union") began efforts to organize Fortune Bay's employees. (*Id.*) On or about August 4, 2008, Fortune Bay terminated employee Rorie Farr, a Band member, based on her alleged failure to show up for work as scheduled without giving notice as required under Fortune Bay's personnel policy. (*Id.*) The Board claims that Farr orally appealed her discharge to the Band's Tribal Chairman. On August 18, 2008, the Union filed an unfair labor practice charge with the Board alleging that Farr's termination was motivated by the Union's organizing activities, but the Union withdrew that charge on October 9, 2008. (*Id.* at 4 & n. 1; Response to Order to Show Cause at 4, Docket No. 7.) The Tribal Chairman later told Farr that she was rehired, but Fortune Bay's CEO withdrew the reinstatement offer. (Board's Mem. in Supp. at 4, Docket No. 2.)

On October 14, 2008, the Union filed another charge against Fortune Bay alleging that Fortune Bay violated subsections (1), (3), and (4) of section 8(a) the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, by refusing to reinstate Farr in retaliation for participating in a previous case before the Board and in retaliation for engaging in union activities. (*Id.* at 1.) After the Union filed its charge, the Board, through its General Counsel, com-

menced an investigation in accordance with section 10(a) of the NLRA and section 102.15 of the Board's Rules to determine whether Fortune Bay had engaged in unfair labor practices. (Application ¶ 3, Docket No. 1); *see also* 29 U.S.C. §§ 153(a),(d), 159(c)(1), 160(a). On October 31, 2008, the Board served on Fortune Bay a subpoena duces tecum to appear before an agent of the Board and produce certain subpoenaed documents. (*Id.* ¶ 4.) The subpoena "seeks information relevant to [Fortune Bay's] effects on commerce, to establish federal jurisdiction, . . . to [establish] attributes of tribal sovereignty, [and] to establish whether the Board will consider [Fortune Bay] an 'employer' within the meaning of the NLRA." (Board's Mem. in Supp. at 1–2, Docket No. 2.) Fortune Bay objected to the subpoena, and the Board applied to this Court for an order to enforce the subpoena pursuant to section 11(2) of the NLRA. (Application, Docket No. 1.)

After receiving a response from Fortune Bay to the Magistrate Judge's Order to Show Cause, as well as the Board's reply and Fortune Bay's surreply, the Magistrate Judge filed a Report and Recommendation recommending that the Court grant the Board's Application. The Magistrate Judge concluded in her Report and Recommendation that (1) the Court has jurisdiction over the subpoena enforcement proceeding; (2) the instant enforcement action was brought by the Board, as an administrative agency of the United States, and not by a private party; (3) the Court has personal jurisdiction over Fortune Bay and subject matter jurisdiction over the subpoena enforcement action; and (4) that the subpoena should be enforced. (Report & Recommendation, Docket No. 14.) Fortune Bay timely filed objections to the Report and Recommendation, arguing that (1) under established Indian-law canon and Eighth Circuit law, the Board did not have jurisdiction to issue

the subpoena; and (2) the Band is immune from the underlying Board proceeding under the NLRA on sovereignty grounds because a private party—the Union—initiated that proceeding.

## DISCUSSION

The primary issue before the Court is whether the Board had jurisdiction under the NLRA to issue the subpoena on Fortune Bay, a business enterprise wholly owned and managed by the Band on the Band's Lake Vermillion Reservation. For the reasons set forth below, the Court concludes that the Board had jurisdiction to issue the subpoena in an effort to establish the NLRA's coverage over Fortune Bay, and the Court may enforce that subpoena.

## I. THE BOARD HAD JURISDICTION TO ISSUE THE SUBPOENA.

### A. The Board's Investigative Role

The Board's subpoena seeks information relating to Fortune Bay's effects on interstate commerce, to federal jurisdiction, to attributes of tribal sovereignty, and to Fortune Bay's status as an "employer" within the meaning of the NLRA. (Board's Mem. in Supp. at 2, Docket No. 2.)

■ In considering whether to enforce the Board's subpoena, the Court is not concerned with the merits of the underlying claim, and does not consider Fortune Bay's potential defenses to the merits of the underlying proceeding. *Cf. E.E.O.C. v. Tempel Steel Co.*, 814 F.2d 482, 484–86 (7th Cir.1987). Instead, the Court considers four factors: (1) whether the subpoena was issued pursuant to lawful authority; (2) whether the subpoena was issued for a lawful purpose; (3) whether the information requested in the subpoena is relevant to the lawful purpose; and (4) whether the subpoena was reasonable. *See United*

*States v. McDonnell Douglas Corp.*, 751 F.2d 220, 226 (8th Cir.1984) (citing *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–09, 66 S.Ct. 494, 90 L.Ed. 614 (1946)). In other words, as the Eighth Circuit held in *E.E.O.C. v. Peat, Marwick, Mitchell & Co.*, "[t]he showing of reasonable cause required to support an application for enforcement of a subpoena duces tecum is satisfied . . . by the court's determination that the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry." 775 F.2d 928, 930 (8th Cir.1985) (internal quotation marks omitted; second alteration in original).

In *Peat, Marwick, Mitchell & Co.*, the Eighth Circuit affirmed a district court's order requiring an employer to produce documents subpoenaed by an administrative agency, the Equal Employment Opportunity Commission ("EEOC"), in relation to the EEOC's investigation of alleged violations of the Age Discrimination in Employment Act ("ADEA"). 775 F.2d at 931. The employer appealed the district court's order, arguing that the subpoena could not be enforced because the EEOC's investigation was not for a congressionally authorized, legitimate purpose; that is, the employer argued that the ADEA did not apply to the employer. *Id.* 929–30. The Eighth Circuit rejected the argument, stating:

> Congress has established the EEOC as the administrative body empowered to investigate violations of the ADEA and has given the EEOC subpoena power in order to carry out its investigations. The authority to investigate violations includes the authority to investigate coverage under the statute. It can no longer be disputed that "a subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute." The initial determination of the coverage question is left to the administrative agency seeking enforcement of the subpoena. Often a coverage question cannot be resolved **until the administrative agency has had an opportunity to examine the subpoenaed records.**

*Id.* at 930 (emphasis added and citations omitted).

■ Here, the Board seeks subpoenaed documents to establish jurisdiction to bring unfair labor practice charges under the NLRA against Fortune Bay. In that sense, the Board's application is akin to jurisdictional discovery, as it seeks documentation pertaining to federal jurisdiction and tribal sovereignty. Under these circumstances, the Board's subpoena duces tecum is reasonable in scope and is brought for a legitimate purpose. *See id.* ("The EEOC's investigation of [the employer] is in an effort to determine whether [the employer's] retirement practices and policies discriminate against individuals classified as employees for purposes of the ADEA. Thus, EEOC's investigation is for a legitimate purpose authorized by Congress.").

Fortune Bay objects to the Magistrate Judge's conclusion that the Board issued the subpoena pursuant to lawful authority. Fortune Bay primarily argues that the Magistrate Judge failed to apply the appropriate standard in concluding that the NLRA applies to the Band, and thus that the Board had jurisdiction to issue the subpoena in the first place.

Although the Court need not consider the merits of the underlying proceeding, the parties' dispute about the correct standard to apply for evaluating the NLRA's application to Fortune Bay is intertwined with the Board's asserted authority to issue the subpoena in the first place. Fortune Bay argues that application of the NLRA to the Band would violate its rights of self-government and territorial sovereignty. Fortune Bay argues that under

Eighth Circuit law, the NLRA does not apply to the Band, and therefore the Board has no authority under section 11 of the NLRA to issue the subpoena.

The Court thus turns to a discussion of the appropriate standard for determining whether the NLRA applies to Fortune Bay and the Band. Although the Court does not reach the question of whether the NLRA applies to the Band and Fortune Bay, the Court concludes that the Board had a legitimate and lawful basis for issuing the subpoena in pursuit of its investigation to establish jurisdiction.

**B. The Board's Authority to Issue Subpoenas Under the NLRA**

■ The NLRA charges the Board with the responsibility of preventing and remedying unfair labor practices by employers, unions, or any other person. *See* 29 U.S.C. §§ 159(c), 160. The Board may not perform that function and commence a full investigation into allegedly unfair labor practices, however, until it determines that the employer affects interstate commerce and is an "employer" under the NLRA. *See id.* §§ 159(c), 161. Section 11 of the NLRA grants the Board broad investigatory authority, including the power to subpoena evidence "that relates to any matter under investigation or in question." *Id.* § 161(1); *see, e.g., N.L.R.B. v. Interstate Material Corp.*, 930 F.2d 4, 6 (7th Cir. 1991); *N.L.R.B. v. Steinerfilm, Inc.*, 702 F.2d 14, 15 (1st Cir.1983). This broad subpoena power enables the Board "to get information from those who best can give it and who are most interested in not doing so." *Cf. United States v. Morton Salt Co.*, 338 U.S. 632, 642, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

■ The NLRA authorizes the Board to assert jurisdiction over all conduct that may be constitutionally regulated under the Commerce Clause. *N.L.R.B. v. Fainblatt*, 306 U.S. 601, 604–07, 59 S.Ct. 668, 83

L.Ed. 1014 (1939). The Board has limited its jurisdictional authority to employers that have a "substantial" effect on interstate commerce. *El Dorado, Inc.*, 151 N.L.R.B. 579, 582 (1965).

■ Although the Board has broad authority to issue subpoenas, it does not have independent authority to enforce them. Section 11(2) of the NLRA grants federal district courts jurisdiction to enforce subpoenas issued by the Board. 29 U.S.C. § 161(2). The Board may seek enforcement of subpoenas in any district where the investigation is undertaken or where the subpoenaed entity is found, resides, or transacts business. *See id.; N.L.R.B. v. Line*, 50 F.3d 311, 313 (5th Cir.1995) ("[T]he place of inquiry in 29 U.S.C. § 161(2) is the jurisdiction of the underlying NLRB investigation.").

Given the Board's general authority to issue subpoenas, the Court turns to the question of whether the Board, pursuant to the NLRA, may issue a subpoena on Fortune Bay, which is wholly owned and managed by a federally recognized tribe.

**C. Application of the NLRA to Tribal Enterprises.**

■ The Commerce Clause of the United States Constitution states in relevant part that "Congress shall have power to ... regulate Commerce ... with the Indian Tribes." U.S. Const. Art. I, section 8, cl. 3. Congress may not exercise that power with respect to tribal nations, however, unless the tribe waives sovereign immunity or unless Congress authorizes the waiver of such immunity. *See United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940).

■ The Supreme Court "has consistently declared that in passing the National Labor Relations Act, Congress intended to and did vest in the Board the fullest

jurisdictional breadth constitutionally permissible under the Commerce Clause." *N.L.R.B. v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 226, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963). The NLRA does not expressly exclude tribal nations as employers from coverage, but does expressly exclude "the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act." 29 U.S.C. § 152(2).

The Board initially interpreted the NLRA to implicitly exclude tribal nations from coverage under the statute, finding that, based on tribal sovereign immunity, Indian tribes were included in the exemption of "any State or political subdivision thereof." *See, e.g., S. Indian Health Council, Inc.* 290 N.L.R.B. 436, 437 (1988); *Fort Apache Timber Co.,* 226 N.L.R.B. 503, 506 (1976). The Board later rejected that interpretation after finding that "[a]s tribal businesses have grown and prospered, they have become significant employers of non-Indians and serious competitors with non-Indian owned businesses." *San Manuel Indian Bingo & Casino (San Manuel I),* 341 N.L.R.B. 1055, 1056 (2004). In *San Manuel I,* the Board stated that it would consider whether it has jurisdiction on a case-by-case basis, regardless of whether a tribal enterprise was located on or off a reservation. *Id.* at 1059–60, 1062 ("[T]here is nothing in NLRA Section 2(2) [1] to suggest that the exemption for 'employer' turns on **where** the entity is located.").

 The Board's present case-by-case analysis provides that the Board will assert jurisdiction unless (1) the federal Indian policy requires that the Board decline jurisdiction, or (2) policy considerations militate against the assertion of the Board's discretionary jurisdiction. *See San Manuel I,* 341 N.L.R.B. at 1059–63. The first prong is premised on a three-factor test established by the United States Supreme Court in *Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 115–18, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), as narrowed by exceptions described by the Ninth Circuit in *Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113, 1116 (9th Cir.1985). In *Tuscarora,* the United States Supreme Court stated "that a general statute in terms applying to all persons includes Indians and their property interests." 362 U.S. at 116, 80 S.Ct. 543. In *Coeur d'Alene,* the Ninth Circuit cited *Tuscarora* as a general rule, and held that federal statutes of general applicability that are silent as to the applicability of their provisions to Indian tribes apply to tribal enterprises unless one of three exceptions applies:

> (1) the law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations...."

*Coeur d'Alene,* 751 F.2d at 1116 (quoting *United States v. Farris,* 624 F.2d 890, 893–94 (9th Cir.1980)); *see also San Manuel I,* 341 N.L.R.B. at 1059; *Sac & Fox Indus., Ltd.,* 307 N.L.R.B. 241, 244 (1992).

The Magistrate Judge applied the *Tuscarora–Coeur d'Alene* analysis—in addition to the second policy prong outlined by the Board in *San Manuel I*—to conclude that the Board had jurisdiction to issue the subpoena on Fortune Bay. Fortune Bay argues that the Magistrate Judge erred in

---

1. Section 2(2) of the NLRA "vests jurisdiction in the Board over any 'employer' doing business in this country save those Congress excepted with careful particularity." *San Manuel I,* 341 N.L.R.B. at 1057 (some internal quotations marks omitted).

applying the *Tuscarora–Coeur d'Alene* standard because that standard (1) is based on non-binding dicta from the Supreme Court; (2) addresses only statutes of general application (and Fortune Bay contends that the NLRA is not generally applicable); and (3) is trumped by Eighth Circuit law and long-standing Indian-law canons. (Objections to Report & Recommendation at 3, Docket No. 15.) As to the third argument, Fortune Bay argues that the Court should apply the standard delineated by the Eighth Circuit in *E.E.O.C. v. Fond du Lac Heavy Equipment & Construction Co.*, 986 F.2d 246 (8th Cir.1993). The Court briefly describes the *Fond du Lac* standard below before addressing Fortune Bay's arguments in order.

In *Fond du Lac*, the Eighth Circuit reiterated the Supreme Court's statement in *Tuscarora* that "general acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary." *Id.* at 248 (internal quotation marks omitted). The Eighth Circuit further noted:

> This general rule in *Tuscarora*, however, does not apply when the interest sought to be affected is a specific right reserved to the Indians. **Specific Indian rights** will not be deemed to have been abrogated or limited absent a "clear and plain" congressional intent. A clear and plain intent may be demonstrated by an "express declaration" in the statute, by the "legislative history," and by "surrounding circumstances."

*Id.* (emphasis added; citations omitted). According to the Eighth Circuit, "[a]lthough the specific Indian right involved usually is based upon a treaty, such rights may also be based upon statutes, executive agreements, and federal common law." *Id.* The Eighth Circuit explained that "areas traditionally left to tribal self-government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms applying to all persons, includes [sic] Indians and their property interests." *Id.* (internal quotation marks omitted).

Fortune Bay argues that under *Fond du Lac*, the NLRA affects the Band's specific Indian rights of self-governance and, because there is no evidence of congressional intent to apply that statute to tribes, the statute may not be applied to the Band.[2] (Objections to Report & Recommendation at 8, Docket No. 15.)

### D. Fortune Bay's Objections
#### 1. *Tuscarora* as Dictum

Fortune Bay first contends that the Court need not follow the *Tuscarora* "rule" because it is non-binding dictum. (Objections to Report & Recommendation at 3, Docket No. 15.) Indeed, other courts have noted that the *Tuscarora* rule is "of uncertain significance, and possibly dictum, given [that] .... the Federal Power Act at issue in *Tuscarora* included a specific limitation on eminent domain on Indian Reservations." *San Manuel II*, 475

---

**2.** The District of Columbia Circuit Court of Appeals, in reviewing an appeal from the Board's conclusions in *San Manuel I*, offered an alternative approach for evaluating whether a statute of general applicability applies to tribal nations. *San Manuel Indian Bingo & Casino v. N.L.R.B. (San Manuel II)*, 475 F.3d 1306, 1313 (D.C.Cir.2007) ("[T]he 'inquiry [as to whether a general law inappropriately impairs tribal sovereignty] is not dependent on mechanical or absolute conceptions of ... tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake.' ") (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)). The parties do not discuss that alternative test, however, and the Court accordingly does not apply that test here.

F.3d at 1311; *see also Coeur d'Alene,* 751 F.2d at 1115. The characterization of *Tuscarora's* language as dictum, however, appears to have had little effect on courts' willingness to adopt its language as a "general rule." The very case Fortune Bay cites in support of its arguments recites the "general rule in *Tuscarora.*" *Fond du Lac,* 986 F.2d at 248; *see also Coeur d'Alene,* 751 F.2d at 1115 ("[Respondent] may be correct when it argues that this language from *Tuscarora* is dictum, but it is dictum that has guided many of our decisions."). Thus, although the language in *Tuscarora* may be dictum, the Court finds no reason to depart from other courts' reliance on that language in similar cases.

The Court also finds that the crux of the parties' dispute is about what exceptions apply to that general rule. The Board contends that the Court should evaluate the Board's jurisdiction to issue the subpoena under the exceptions outlined in *Coeur d'Alene.* In contrast, Fortune Bay contends that the Court must assess the Board's jurisdiction to issue the subpoena under the "specific Indian rights" exception provided in *Fond du Lac.* The two cases, in fact, share noticeable similarities. As a threshold matter, both cases first direct a court to inquire whether the statute at issue is generally applicable. *Coeur d'Alene,* 751 F.2d at 1115; *Fond du Lac,* 986 F.2d at 248. Both cases provide for exceptions to a statute's application to tribes where the statute impinges on certain rights reserved to the Indians, including certain rights of tribal self-government. *Coeur d'Alene,* 751 F.2d at 1116–17; *Fond du Lac,* 986 F.2d at 248. The cases also call for courts to consider congressional intent when determining whether a law falls within an exception to the *Tuscarora* rule. *See Coeur d'Alene,* 751 F.2d at 1115; *Fond du Lac,* 986 F.2d at 248.

As Fortune Bay notes, however, the cases are dissimilar with respect to their approach to congressional intent and the legislative record. In *Coeur d'Alene,* the Ninth Circuit outlines an exception to *Tuscarora* where there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations." *Coeur d'Alene,* 751 F.2d at 1116 (internal quotation marks omitted; alteration in original). That is, a generally applicable statute that is silent about its applicability to tribes will apply to tribes **unless** there is proof that Congress intended that the law not apply to tribes (or if one of two other *Coeur d'Alene* exceptions applies). In *Fond du Lac,* the Eighth Circuit states that specific rights reserved to Indians will not be deemed abrogated or limited by a statute of general applicability "absent a clear and plain congressional intent" through express declaration in the statute, legislative history, or surrounding circumstances. *Fond du Lac,* 986 F.2d at 248 (internal quotation marks omitted). In other words, unless there is clear and plain congressional intent to the contrary, a statute that is silent about its applicability to tribes is presumed **not** to apply to tribes if the statute abrogates or limits "specific Indian rights."

### 2. The NLRA Is a Statute of General Applicability.

Fortune Bay next argues that the Court does not need to address the principle in *Tuscarora* because the NLRA is not a statute of general applicability. (*See* Objections to Report & Recommendation at 3, Docket No. 15; Response to Order to Show Cause at 31, Docket No. 7.) In support, Fortune Bay cites a Tenth Circuit case, *N.L.R.B. v. Pueblo of San Juan,* which concludes that "the NLRA by its terms is not a statute of general application, it excludes states and territories."

280 F.3d 1278, 1283 (10th Cir.2000). Other cases, however, assume or conclude that the NLRA is a generally applicable statute. *See, e.g., San Manuel II,* 475 F.3d at 1312; *N.L.R.B. v. Chapa De Indian Health Program, Inc.,* 316 F.3d 995, 998 (9th Cir.2003).

*Pueblo of San Juan* is not directly relevant to the Court's analysis; the Tenth Circuit considered "whether the NLRA preempts an Indian tribe from adopting a right-to-work ordinance applicable to employees of a non-Tribal company engaged in business activities on a reservation." 280 F.3d at 1282. The Tenth Circuit did not hold that the NLRA does not apply to Indian tribes acting as employers, and in fact stated in its opinion after a rehearing *en banc:* "We begin by noting what the district court also took pains to point out, namely, that the general applicability of federal labor law is not at issue." *N.L.R.B. v. Pueblo of San Juan,* 276 F.3d 1186, 1191 (10th Cir.2002) (en banc).

While the Eighth Circuit has not addressed the issue with respect to the NLRA, the Ninth Circuit has provided substantive analysis concluding that the NLRA is a statute of general applicability. In *Chapa De,* the Ninth Circuit rejected the contention that the NLRA is not a statute of general applicability merely because it has some exemptions. 316 F.3d at 998. The Ninth Circuit concluded that "[t]he issue is whether the statute is generally applicable, not whether it is universally applicable. We have previously held that other federal statutes that contain exemptions are nevertheless generally applicable." *Id.* (citing cases holding that

the Occupational Safety and Health Act ("OSHA"), the Employee Retirement Income Security Act ("ERISA"), and the Contraband Cigarette Trafficking Act ("CCTA") are statutes of general applicability).

In sum, the NLRA's "exemptions are relatively limited," *Id.,* 316 F.3d at 998, and Congress clearly intended that the NLRA's reach would be broad, *Reliance Fuel Oil Corp.,* 371 U.S. at 226, 83 S.Ct. 312 ("Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause."). It is not necessary that the NLRA be universally applicable, only that it be generally applicable. Accordingly, the Court proceeds based on the threshold conclusion that the NLRA is a statute of general applicability.

**3. The Board Had a Legitimate Purpose for Issuing the Subpoena Under These Circumstances and Did So Pursuant to Lawful Authority.**

 Fortune Bay argues that the *Fond du Lac* standard should "be the starting point" for the Court's analysis. (Objections to Report & Recommendation at 3, Docket No. 15.) The Court does not need to reach the issue of whether it must apply the *Fond du Lac* standard in these circumstances or whether the *Fond du Lac* standard can be reconciled with the *Tuscarora–Coeur d'Alene* standard,[3] because, as the Court concludes below, even under the *Fond du Lac* standard, the Board has jurisdiction to issue the subpoena.

---

**3.** The U.S. Court of Appeals for the District of Columbia noted that the principle announced in *Fond du Lac* is reconcilable with *Tuscarora:*

> With regard to the alternative principle relied on by petitioners, that a clear statement of Congressional intent is necessary before a court can construe a statute to limit tribal

> sovereignty, we can reconcile this principle with *Tuscarora* by recognizing that, in some cases at least, a statute of general application can constrain the actions of a tribal government without at the same time impairing tribal sovereignty.

*San Manuel II,* 475 F.3d at 1312.

Under *Fond du Lac*, the threshold question before the Court is whether the NLRA affects "a specific right reserved to the Indians," which may include "areas traditionally left to tribal self-government." *Fond du Lac*, 986 F.2d at 248. Fortune Bay contends that "this case most certainly does involve specific Indian rights," including the Band's "sovereign rights to govern itself, regulate its internal matters, and manage its own economic resources." (Objections to Report & Recommendation at 6, Docket No. 15.) In particular, Fortune Bay asserts that "[t]he Band's operation of the Fortune Bay Casino is **directly** tied to its provision of governmental programs and services to its members," and notes that the Band's operation of Fortune Bay is "not mere corporate behavior," but "is the very heart of its governmental activity.... It is its youth programs, elderly assistance programs, emergency services, [and] health care services." (*Id.* at 6–7 (internal quotation marks omitted).)

The Court concludes, however, that it is unclear in this case whether the NLRA affects rights specifically reserved to the Band. Recent case law demonstrates that facts relating to Fortune Bay's impact on non-Indians and interstate commerce may play a significant role in the Board's determination of whether it has jurisdiction to issue an unfair labor practices complaint against Fortune Bay. Here, Fortune Bay asserts that "[t]he Casino employs approximately 450 people, and one-third of these are Indians. Of the Indians employed at the Casino, 82% are members of the Band." (Response to Order to Show Cause at 19, Docket No. 7.) Fortune Bay's customer base includes both Band members and nonmembers, which the Court presumes includes non-Indians. (*See* Board's Mem. in Supp. at 3, Docket No. 2.) And although Fortune Bay is located entirely on the Band's Lake Vermillion reservation,

that fact is not dispositive to the NLRA's applicability to the Band.

In *San Manuel I*, the Board concluded that it would not rely purely on considerations of location to decide whether the NLRA was a statute of general applicability that applied to tribal enterprises. *San Manuel I*, 341 N.L.R.B. at 1058–59. Rather, the Board concluded that it would evaluate the NLRA's applicability to a tribal enterprise on a case-by-case basis. *See id.* The Board explained that, in rejecting its previous conclusion that the NLRA implicitly excluded tribal nations from coverage, "tribal businesses have grown and prospered, [and] they have become significant employers of non-Indians and serious competitors with non-Indian owned businesses." 341 N.L.R.B. at 1056.

The United States Court of Appeals for the D.C. Circuit in *San Manuel II* also referred to the evolution and growth of tribal businesses:

> [T]he NLRA was enacted by a Congress that in all likelihood never contemplated the statute's potential application to tribal employers, and probably no member of that Congress imagined a small Indian tribe might operate like a closely held corporation, employing hundreds, or even thousands, of non-Indians to produce a product it profitably marketed to non-Indians. Further, the casino at issue here, though certainly exhibiting characteristics that are strongly commercial (non-Indian employees and non-Indian patrons), is also in some sense governmental (the casino is the primary source of revenue for the tribal government).

*San Manuel II*, 475 F.3d at 1310–11.

In developing its own analysis to determine whether the NLRA applies to a tribe, the D.C. Circuit emphasized the necessity of examining the facts relating to tribal

sovereignty and the commercial impact of a tribal enterprise:

> [W]hen a tribal government goes beyond matters of internal self-governance and enters into off-reservation business transaction[s] with non-Indians, its claim of sovereignty is at its weakest. In [that] situation, courts recognize the capacity of a duly established tribal government to act as an unincorporated legal person, engaging in privately negotiated contractual affairs with non-Indians, **but the tribal government does so subject to generally applicable laws.** The primary qualification to this rule is that the tribal government may be immune from suit.

*San Manuel II*, 475 F.3d at 1312–13 (emphasis added and citations omitted).

In *Coeur d'Alene*, the Ninth Circuit similarly addressed facts where a commercial enterprise, wholly owned and operated by an Indian tribe, was substantially linked to and involved with non-Indians: "[Respondent] employs approximately twenty workers, some of whom are non-Indians. The Farm manager himself is a non-Indian." *Coeur d'Alene*, 751 F.2d at 1114. More recently, the Ninth Circuit in *Chapa De* applied the *Coeur d'Alene* standard where the tribal enterprise, a health services program, was controlled by a board of directors that had no members of the autho-

rizing tribe on its roster and where "[a]pproximately 405 of the patients [the tribal enterprise] serves are non-Native American, and 55% of [the tribal enterprise's] non-professional staff members are non-Native American." *Chapa De*, 316 F.3d at 997, 999.

Those cases and the Board's decision in *San Manuel I* demonstrate that facts relating to a tribal enterprise's impact on interstate commerce, particularly where the tribal enterprise's activities involve significant numbers of non-Indians, are relevant to the consideration of whether the NLRA applies to the tribal enterprise. Here, facts regarding, *inter alia*, Fortune Bay's commercial relationship to significant numbers of non-Indian employees and its substantial non-Indian customer base are pertinent to the Board's resolution of the jurisdiction question. It appears that Fortune Bay's "activities are commercial in nature—not governmental. Moreover, the operation of a casino—which employs significant numbers of non-Indians and that caters to a non-Indian clientele—can hardly be described as vital to the tribes' ability to govern themselves or as an essential attribute of their sovereignty." [4] *See San Manuel I*, 341 N.L.R.B. at 1061 (internal quotation marks omitted).

In sum, given Fortune Bay's potential commercial impact on and relationship

---

4. The Magistrate Judge concluded that, as analyzed under the "intramural matters" exception in *Coeur d'Alene*, "the means by which [Fortune Bay] generates its revenue to support [tribal government programs]" are not necessarily related to the Band's sovereign right to govern itself. (*See* Report & Recommendation at 13, at Docket No. 14.) Fortune Bay objects to that conclusion, arguing that the Band's operation of Fortune Bay does not merely support the tribal programs, but instead is "the very heart of governmental activity." (Objections to Report & Recommendation at 7, Docket No. 15.) In this subpoena enforcement action, the Court does not ultimately conclude whether the primary

source of the Band's revenues for government programs is directly related to specific Indian rights. (*See* Response to Order to Show Cause at 19, Docket No. 7 ("[F]ully 100% of the Casino's profits are returned to the tribal government to fund governmental operations and programs like health care services, education, emergency services, youth programs, elder assistance, housing programs, economic development, road work, and community water and sewer systems.").) In the Court's analysis, that fact constitutes one portion of an entire array of facts, the details of which the Board is entitled to discover to determine whether it has jurisdiction to issue a complaint against Fortune Bay under the NLRA.

to non-Indians, the Board has a reasonable and legitimate basis for issuing the subpoena seeking additional information regarding Fortune Bay's effects on interstate commerce, the affiliation of customers and employees, applicable treaties, and other similar information. *See Peat, Marwick, Mitchell & Co.*, 775 F.2d at 929–30. Fortune Bay does not substantively address the Magistrate Judge's analysis under the *Coeur d'Alene* standard, but the Court adopts that analysis to the extent that it supports the conclusion here that the Board properly issued the subpoena pursuant to its investigative role.

## II. SOVEREIGN IMMUNITY DOES NOT BAR THE BOARD'S ISSUANCE OF A SUBPOENA

Fortune Bay further argues that "the Band is immune from the proceeding in which the subpoena issued" because, according to Fortune Bay, the action was brought by the Union, a private litigant. (Objections to Report & Recommendation at 10, Docket No. 15.) Fortune Bay contends that "this Court must decide whether the Band is immune from a subpoena issued in an action **before** the Board **by** the United Steelworkers, an undisputedly private complainant." (*Id.* at 11.)

This subpoena enforcement action originated when the Board's General Counsel initially requested that the Board, as an administrative agency of the United States government, issue a subpoena duces tecum to Fortune Bay. (Application at 1, Docket No. 1.) The fact that the Board has yet to "issue[ ] a complaint against the Band," (Objections to Report & Recommendation at 11, Docket No. 15), has little impact on the Court's analysis. The Board has not issued a complaint because it is waiting for Fortune Bay to provide documents pursuant to the subpoena that may establish its jurisdiction to do so.

▇▇▇▇ Further, the Court concludes that the underlying proceeding is a proceeding by the United States, through the Board, and sovereign immunity does not bar this action. In a prosecution under the NLRA, the Board's General Counsel is responsible for enforcing the public interest, not for enforcing the rights of private litigants. *Vaca v. Sipes*, 386 U.S. 171, 182–83 & n. 8, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Philip Carey Mfg. Co. v. N.L.R.B.*, 331 F.2d 720, 734 (6th Cir.1964) ("The General Counsel, like the Board, is charged with the responsibility of representing the public interest, not that of private litigants."). "[J]ust as a state may not assert sovereign immunity as against the federal government, neither may an Indian tribe, as a dependent nation, do so." *United States v. Red Lake Band of Chippewa Indians*, 827 F.2d 380, 382–83 (8th Cir.1987) (citation omitted).

Fortune Bay notes that the Supreme Court in *Federal Maritime Commission v. South Carolina State Ports Authority*—a suit brought by a private party—distinguished between cases brought **by** a federal agency and cases brought **before** a federal agency. 535 U.S. 743, 760, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002). That distinction, however, is of little import in this case. The Board, a federal agency, issued the subpoena, just as it brought the enforcement proceeding in this Court. Indeed, Fortune Bay concedes that "it is not immune from this instant enforcement proceeding because it was brought by the Board as an agent of the United States." (Response to Order to Show Cause at 9, Docket No. 7.) The Court is not persuaded that Fortune Bay is nonetheless immune from responding to the subpoena, which was issued by the Board, merely because the Union, a private party, filed charges with the Board.

In sum, the Magistrate Judge did not err in concluding that the Board had jurisdiction to issue a subpoena in these circumstances. Accordingly, the Court adopts the Report and Recommendation as clarified by the above reasoning and grants the Board's application for an order enforcing the subpoena duces tecum.[5]

## ORDER

Based on the foregoing and the records, files, and proceedings herein, the Court **OVERRULES** respondent Fortune Bay Resort Casino's objections [Docket No. 15] and **ADOPTS** the Report and Recommendation of the Magistrate Judge dated June 1, 2009, [Docket No. 14] as discussed in this Memorandum Opinion. Accordingly, **IT IS HEREBY ORDERED** that:

1. The Board's Application for an Order Requiring Obedience to Subpoena Duces Tecum (Docket No. 1) is **GRANTED.**

2. Fortune Bay is ordered to appear before an agent of the Board at a time, date, and location to be set by the Board; to produce the subpoenaed documents; and to testify and answer any and all questions relevant to the matters in question in the proceedings before the Board.

3. Fortune Bay's Motion for Summary Judgment [Docket No. 17] is **DENIED as moot.**

**IT IS HEREBY FURTHER ORDERED** that:

4. The Board's Motion for Voluntary Dismissal Without a Hearing [Docket No. 24] is **DENIED as moot.**[6]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

## REPORT AND RECOMMENDATION

JEANNE J. GRAHAM, United States Magistrate Judge.

This matter is before the undersigned United States Magistrate Judge on the

---

**5.** The Court expects that the filing of this Order will resolve the issues relating to Fortune Bay's motion for summary judgment, (Docket No. 17), and the Board's motion to dismiss.

**6.** On January 15, 2010, the Board filed a motion for voluntary dismissal of the enforcement action without prejudice, stating that it had reviewed "additional facts gathered by [the Board] in the intervening months since this petition was filed ... and [those facts] are considered sufficient for the Board's General Counsel to determine whether an administrative complaint could issue." (Docket No. 26 at 2.) As a consequence, the Board contends that the "case has become moot and that a Court ruling either enforcing or refusing to enforce the NLRB subpoena will not materially affect the rights of either party." (*Id.* at 2.)

The Court may grant a plaintiff's request for voluntary dismissal "on terms that it considers proper." Fed.R.Civ.P. 41(a)(2). "[A] dismissal pursuant to Rule 41(a)(2) is not one of right but is rather a matter for the discretion of the trial court." *Great Rivers Coop. of SE Iowa v. Farmland Indus., Inc.*, 198 F.3d 685, 689 (8th Cir.1999) (internal quotation marks

omitted). Here, the Board asks that the Court dismiss the action without prejudice. However, should the Board ultimately determine that it has insufficient facts to bring an unfair labor practices complaint against Fortune Bay, the Board would not be barred from bringing a new enforcement action in this Court. Dismissing the case without prejudice would thus permit the Board to file duplicative future enforcement actions relating to the same circumstances discussed *supra*. *See Hamm v. Rhone–Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 950 (8th Cir. 1999) (stating that when the Court reviews a motion for voluntary dismissal, the Court considers, *inter alia*, "whether the party has presented a proper explanation for its desire to dismiss; whether a dismissal would result in a waste of judicial time and effort; and whether a dismissal will prejudice the defendants" (citations omitted)). Accordingly, although the Court denies the Board's motion as moot, in these circumstances the Court would also exercise its discretion to deny the Board's motion on the merits.

National Labor Relations Board's Application for an Order Requiring Obedience to Subpoena Duces Tecum. (Docket No. 1.) The National Labor Relations Board is represented by Joseph H. Bornong. Fortune Bay Resort Casino is represented by Henry M. Buffalo, Jr., Jessica Intermill, Joseph F. Halloran, Mark A. Anderson, and William A. Szotkowski. For the reasons discussed below, the undersigned recommends that the application be granted and the subpoena duces tecum be enforced.[1]

## I. BACKGROUND

Respondent Fortune Bay Resort Casino ("Respondent") is a wholly-owned and managed governmental entity of the Bois Forte Band of Chippewa Indians ("Band"), a federally-recognized Indian tribe. (Resp't's Resp. to Order to Show Cause at 18; Docket No. 7.) Respondent operates a hotel, resort, and casino on the Band's Lake Vermilion Reservation under a tribal gaming ordinance and license issued by the Bois Forte Reservation Tribal Council. (*Id.* at 3.) Respondent employs both Band members as well as nonmembers. (Board's Mem. Supp. at 3; Docket No. 2.) Specifically, Respondent employs approximately 450 people, one-third of whom are Native American; and of the Native Americans employed, eighty-two percent are Band members. (Resp't's Resp. to Order to Show Cause at 19; Docket No. 7.) Respondent's customer base consists of both Band members and nonmembers. (Board's Mem. Supp. at 3; Docket No. 2.)

In 2007, the United Steelworkers Union ("Union") began efforts to organize Respondent's employees, and those efforts are ongoing. (*Id.*) On or about August 4, 2008, Respondent terminated Rorie Farr, a Band member, for allegedly failing to show up for work as scheduled without giving advance notice as required by Respondent's personnel policy. (*Id.*) According to the National Labor Relations Board ("Board"), Farr orally appealed her discharge to the Band's Tribal Chairman, and on August 18, the Union filed an unfair labor practice charge alleging that Farr's termination was motivated by the Union's organizing activities. (*Id.* at 4; Resp't's Resp. to Order to Show Cause at 4; Docket No. 7.)[2] The Tribal Chairman then told Farr she was rehired, but Respondent's CEO withdrew the reinstatement offer. (*See* Board's Mem. Supp. at 4; Docket No. 2.) The Union subsequently filed a charge against Respondent on October 14, 2008, alleging in relevant part that Respondent violated section 8(a)(1), (3), and (4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, by refusing to reinstate Farr in retaliation for her having participated in a previous Board case and for engaging in union and protected concerted activities. (*Id.* at 1.)

Pursuant to congressional authority, the Board, by its General Counsel, has the authority to conduct unfair labor practice investigations upon the filing of a charge. 29 U.S.C. §§ 153(d), 159(c)(1), 160(a). When the Union filed its charge in October 2008, the General Counsel commenced an investigation to determine whether Respondent had engaged in any unfair labor practices, in accordance with section 10(a)

---

1. In its memorandum in support of its application, the Board requested that a District Judge rather than a Magistrate Judge directly rule on its application. (Board's Mem. Supp.; Docket No. 2 at 10–11.) Although the undersigned has authority to decide subpoena enforcement issues in accordance with 28 U.S.C. § 636(b)(1)(A), the Court will recommend the disposition of this matter in a Report and Recommendation to alleviate the Board's concern.

2. The Union later withdrew this charge on October 9, 2008. (Board's Mem. Supp.; Docket No. 2 at 4 n. 1.)

of the NLRA, 29 U.S.C. § 160(a), and section 102.15 of the Board's Rules. (Application at 2, ¶ 3; Docket No. 1.)

The Board issued and served a subpoena duces tecum on Respondent on October 31, 2008, directing Respondent to appear before an agent of the Board on November 13, 2008, and to produce certain subpoenaed documents. (*Id.* ¶ 4.) The subpoena "seeks information relevant to Respondent's effects on commerce, to establish federal jurisdiction, and to attributes of tribal sovereignty, to establish whether the Board will consider Respondent an 'employer' within the meaning of the NLRA." (Application Ex. 2; Docket No. 1–2.) Respondent objected to the subpoena. (Board's Mem. Supp. at 4; Docket No. 2 (citing Anderson Letter, Ex. 3; Docket No. 1–2).) The Board then applied in federal court for an order requiring enforcement of the subpoena, pursuant to section 11(2) of the NLRA. (Application; Docket No. 1.)

On January 6, 2009, the undersigned ordered Respondent to show cause within thirty days of the Order why the subpoena should not be enforced. Respondent filed its response on February 5, 2009 (Docket No. 7), followed by the Board's reply on February 26, 2009 (Docket No. 9), and the Respondent's surreply on April 2, 2009. (Docket No. 13.)

## II. DISCUSSION

Deciding whether the subpoena should be enforced requires resolution of four issues: (1) whether Respondent possesses tribal sovereign immunity from suits brought by the United States; (2) whether the Board's subpoena enforcement action is brought by the United States; (3) whether the Court has jurisdiction over this matter; and (4) ultimately, whether the subpoena should be enforced. The first three issues may be quickly resolved, but the fourth issue presents a more complicated question.

### A. Sovereign Immunity

 The first issue is whether sovereign immunity protects Respondent from suits brought by the United States.[3] As Respondent concedes, tribal sovereign immunity is not absolute against the federal government. *See United States v. Red Lake Band of Chippewa Indians,* 827 F.2d 380, 382 (8th Cir.1987); *see also Quileute Indian Tribe v. Babbitt,* 18 F.3d 1456, 1459 (9th Cir.1994) ("[T]ribal sovereignty does not extend to prevent the federal government from exercising its superior sovereign powers."). Indeed, Respondent further concedes that it "is not immune from this instant enforcement proceeding because it was brought by the Board as an agent of the United States." (Resp't's Resp. to Order to Show Cause at 9; Docket No. 7.) Given this concession, the Court turns to the question of whether the Board's subpoena enforcement action constitutes an action brought by the United States.

### B. An Action Brought by the United States

This subpoena enforcement action has stemmed from the General Counsel's ini-

---

3. Respondent could have tribal sovereign immunity as a tribal corporate entity under the Indian Reorganization Act of 1934, 25 U.S.C. § 477, but there is no need to decide this question. As Respondent notes in its response, the Band is one of six bands of the Minnesota Chippewa Tribe ("MCT"). The Secretary of the Interior issued a corporate charter to the MCT on September 17, 1937, but Congress later revoked the charter in 1996. Pub.L. No. 104–109, § 13, 110 Stat. 763, 765 (codified at 25 U.S.C. § 983c). Thus, "the Band now operates all of its business activities directly—not through a federally or tribally chartered entity." (Resp't's Resp. to Order to Show Cause; Docket No. 7 at 3.)

tial request that the Board, as an administrative agency of the U.S. Government, issue a subpoena duces tecum to Respondent. (Application at 1; Docket No. 1.) Despite Respondent conceding that it is not immune from the enforcement action "because it was brought by an agent of the United States, to enforce its federal subpoena power," it nevertheless claims sovereign immunity because the Board "seeks enforcement of a subpoena issued in an underlying action—one brought by a private party." (Resp't's Resp. to Order to Show Cause at 7–8; Docket No. 7.)

Some jurisdictions have reasoned that service of a federal subpoena upon an employee of a tribal entity is neither a suit, nor an action against a tribe. *See, e.g., United States v. Juvenile Male 1*, 431 F.Supp.2d 1012, 1016 (D.Ariz.2006). The court in *Juvenile Male 1* held that the Navajo Tribe's sovereign immunity did not preclude enforcement of a subpoena duces tecum issued by the district court against employees of tribal entities, inasmuch as service of the subpoena was not a suit against the tribe, and tribal immunity had no application to claims by the United States. *Id.* at 1016–17. The court explained:

> The service of a federal subpoena on an employee of an entity of a tribe is neither a suit, nor one against a tribe.... But it can hardly be contended that federal or state sovereign immunity from suit has any application to the enforcement of a federal subpoena on the custodian of records of a state or federal agency. Federal subpoenas routinely issue to state and federal employees to produce official records or appear and testify in court and are fully enforceable despite any claim of immunity.

*Id.* (citing *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 778 (9th Cir.1994)). Moreover, considering that federal subpoenas can even apply to the President of the United States, the court found it unreasonable that they would not apply to Indian tribes. *Id.* (citing *Cherokee Nation v. S. Kan. Ry. Co.*, 135 U.S. 641, 656, 10 S.Ct. 965, 34 L.Ed. 295 (1890)).

Other jurisdictions have addressed whether a Board's action is one brought by the United States by looking at the respective purposes and characters of the Board and the NLRA. Unlike Title VII, which "depends principally upon private causes of action for enforcement," *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1067 (9th Cir. 2004), the NLRA is enforced primarily through the actions of the Board. *Id.* The Supreme Court noted in *National Licorice Co. v. NLRB:*

> The Board acts in a public capacity to give effect to the declared public policy of the [NLRA] to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining and by protecting the "exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing.

309 U.S. 350, 362, 60 S.Ct. 569, 84 L.Ed. 799 (1940). Likewise, the Board's General Counsel "is charged with the responsibility of representing the public interest, not that of private litigants." *Philip Carey Mfg. Co., Miami Cabinet Div. v. NLRB*, 331 F.2d 720, 734 (6th Cir.1964) ("When, in the prosecution of a complaint, facts come to his knowledge showing that there was insufficient basis for proceeding thereon, it was his duty to make a motion to amend.").

Private actions under the NLRA are available only in exceptional circumstances. *Rivera*, 364 F.3d at 1067 (citing *Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1263*, 489 U.S. 527, 536–37, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989) (recognizing exceptional private actions for breaches of the duty of fair representation and actions to enforce collective bargaining

agreements)). Here, the Board's subpoena enforcement action is not an exceptional circumstance. The subpoena only seeks information relevant to verify Respondent's tribal sovereignty, to determine Respondent's effects on commerce, to determine whether federal jurisdiction exists, and to ascertain whether the Board would consider Respondent an "employer" under the NLRA.

The Court concludes that sovereign immunity is not a bar to enforcement of the Board's subpoena because this subpoena enforcement action is not brought by a private party.

### C. Jurisdiction to Enforce the Subpoena

Although the Board has broad authority to issue subpoenas, it has no independent authority to enforce them. Section 11(2) of the NLRA, 29 U.S.C. § 161(2), grants the federal district courts jurisdiction to enforce the Board's subpoenas. The granting of such power has been approved and exercised repeatedly by the courts. Consistent with the bounds of reasonableness, subpoena enforcement may be sought in any district where the investigation is undertaken or where the subpoenaed entity is found, resides, or transacts business. See 29 U.S.C. § 161(2); NLRB v. Ronny Line, 50 F.3d 311, 313–14 (5th Cir.1995) ("We therefore hold that the place of inquiry in 29 U.S.C. § 161(2) is the jurisdiction of the underlying NLRB investigation."). Since Respondent transacts business within this district from its place of business in Tower, Minnesota, this Court has personal jurisdiction over Respondent and subject matter jurisdiction over this subpoena enforcement proceeding.

### D. Whether the Subpoena Should Be Enforced

In determining whether to enforce this subpoena, this Court is not concerned with the merits of the underlying claim. See EEOC v. Tempel Steel Co., 814 F.2d 482, 484–86 (7th Cir.1987). Furthermore, when making such determinations, courts should not consider defenses to the merits of the underlying proceeding. See id. For example, in Tempel Steel Co., the Seventh Circuit Court of Appeals held that the alleged untimeliness of a discrimination claim levied against an employer in connection with the termination of an employee did not negate the EEOC's investigative authority, and hence, did not provide a proper defense to enforcement of the EEOC's subpoena. Id. at 486. Thus, this Court's role is "sharply limited" in this proceeding because "[i]f every possible defense, procedural or substantive, were litigated at the subpoena enforcement stage, administrative investigations obviously would be subjected to great delay." See id. at 485 (citations omitted).

Four factors guide the Court in determining whether to enforce the administrative subpoena. If the subpoena was (1) issued pursuant to lawful authority and (2) for a lawful purpose, and (3) if the requested information is relevant to the lawful purpose and (4) not unreasonable, then the subpoena should be enforced. See United States v. McDonnell Douglas Corp., 751 F.2d 220, 226 (8th Cir.1984) (citing Okla. Press Publ'g Co. v. Walling, 327 U.S. 186, 208–09, 66 S.Ct. 494, 90 L.Ed. 614 (1946)); see also United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950) (reasoning that "[law-enforcing] agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest"). Each requirement will be discussed in turn.

### 1. Issuance Pursuant to Lawful Authority

Respondent argues that this Court should not enforce the subpoena because

the Board lacked jurisdiction to issue it. Specifically, Respondent argues that Congress did not intend the NLRA to apply to commerce with an Indian tribe or to interstate commerce resulting from business activities located on an Indian reservation, nor did Congress exercise its constitutional power in the NLRA to regulate commerce "with the Indian tribes." (Resp't's Resp. to Order to Show Cause at 6–7, 14; Docket No. 7.) In making this argument, Respondent reframed it as one concerning "jurisdiction" not "coverage" because "a subpoena enforcement proceeding is not the proper forum in which to litigate the question of *coverage* under a particular federal statute," *see Donovan v. Shaw,* 668 F.2d 985, 989 (8th Cir.1982) (emphasis added). There is no need, however, to draw such a fine distinction in the present case. As previously mentioned, this Court may not consider defenses to the merits. *See Tempel Steel Co.,* 814 F.2d at 484–86. But in order for this Court to enforce the Board's subpoena, it must determine whether the Board had authority to issue the subpoena in the first place. *See McDonnell Douglas Corp.,* 751 F.2d at 226; *see also Reich v. Great Lakes Indian Fish & Wildlife Comm'n,* 4 F.3d 490, 492 (7th Cir.1993) ("Questions of regulatory jurisdiction are properly addressed at the subpoena-enforcement stage if, as here, they are ripe for determination at that stage.").

There are several factors in this case complicating the analysis as to whether the Board had authority to issue the subpoena, not the least of which are that Respondent is a tribal entity and that there are unique canons of construction governing the interplay of agency authority and tribal sovereignty. These factors make some of the parties' cited authority irrelevant. For example, *Fresenius Medical Care v. United States* concerned an administrative subpoena served on a medical provider pursuant to a statute, 18 U.S.C. § 3486, which authorized such subpoenas in investigations of federal health care offenses. 526 F.3d 372, 375 (8th Cir.2008). Although *Fresenius* sets forth the relevant standard for enforcement of an administrative subpoena, it provides little other useful guidance in the unique circumstances at hand. However, by charting a course beginning with the Constitution and through the NLRA's plain language, a brief history of the Board, and other case precedent, the Court is able to determine that that subpoena was issued pursuant to lawful authority.

Article I, section 8, clause 3 of the Constitution provides, "Congress shall have power to [ ] regulate Commerce [ ] with the Indian Tribes." In the case of tribal nations, however, such power cannot be exercised without the tribe's waiver of sovereign immunity or by Congress waiving such immunity by congressional consent. *See United States v. U.S. Fid. & Guar. Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940).

Sections 9(c) and 10 of the NLRA charge the Board with two main functions, one of which is relevant to the present case: to prevent and remedy unfair labor practices by employers or unions. 29 U.S.C. §§ 159(c), 160. Once an employer, employee, or union files a charge of an unfair labor practice, the Board cannot perform its charged function until it determines whether the employer affects interstate commerce and constitutes an "employer"[4] under the NLRA. *See* 29 U.S.C.

4. There is no need to resolve whether Respondent is an "employer" under the NLRA at this time. Such an issue is a matter regarding the

NLRA's coverage, and "a subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage

§§ 159(c), 161. Section 11 of the NLRA grants to the Board and its agents broad investigatory authority, including the power to subpoena any evidence "that relates to any matter under investigation or in question." 29 U.S.C. § 161(1); *see also NLRB v. Interstate Material Corp.*, 930 F.2d 4, 6 (7th Cir.1991) (describing the Board's broad investigatory powers); *NLRB v. Steinerfilm, Inc.*, 702 F.2d 14, 15 (1st Cir.1983) (same); *NLRB v. G.H.R. Energy Corp.*, 707 F.2d 110, 113 (5th Cir. 1982) (same). This broad subpoena power enables the Board "to get information from those who best can give it and who are most interested in not doing so." *Morton Salt Co.*, 338 U.S. at 642, 70 S.Ct. 357.

The Supreme Court "has consistently declared that in passing the [NLRA], Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963) (emphasis in original). Notably, the NLRA does not exclude tribal nations from its coverage on its face.[5] The NLRA only expressly excludes "the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person

subject to the Railway Labor Act."[6] 29 U.S.C. § 152(2).

Nonetheless, the Board initially interpreted the NLRA to implicitly exclude Indian tribes as being "any State or political subdivision thereof" under section 2(2) of the NLRA, 29 U.S.C. § 152(2), based on tribal sovereign immunity. *See, e.g., S. Indian Health Council, Inc.*, 290 N.L.R.B. 436, 437 (1988) (finding a health care clinic owned by a consortium of tribes on a reservation implicitly exempt from the NLRA as a governmental entity); *Fort Apache Timber Co.*, 226 N.L.R.B. 503, 506 (1976) (noting the possibility of finding the tribal enterprise explicitly exempt from the NLRA because it was similar to a state).

Later, the Board rejected its prior interpretation by focusing on a tribal enterprise's location rather than on a tribe's sovereign nature. The Board reversed course because " '[a]s tribal businesses have grown and prospered, they have become significant employers of non-Indians and serious competitors with non-Indian owned businesses.' " *San Manuel Indian Bingo & Casino (San Manuel I)*, 341 N.L.R.B. 1055, 1056 (2004). Generally, if a tribal enterprise operated on a reservation, the NLRA implicitly excluded the enterprise. *See, e.g., Fort Apache Timber Co.*, 226 N.L.R.B. at 506. If a tribal enterprise

---

under a particular federal statute." *See Shaw*, 668 F.2d at 989. "[I]n a subpoena enforcement action, the agency cannot be required to demonstrate that the very matter or entity it seeks to investigate under its statutory investigatory powers is covered by the enabling statute since the '[a]uthority to investigate the existence of violations ... include[s] the authority to investigate coverage.' " *Id.* (citations omitted).

5. Congress has, however, specifically excluded tribes from the following: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(1); Title I of the Americans with

Disabilities Act, 42 U.S.C. § 12111(5)(b); and the Workers Adjustment and Retraining and Notification Act, 20 C.F.R. § 639.3(a)(1).

6. Several courts have reasoned that because Congress defined an "employer" by listing specific entities that are *not* employers, the canon of construction *expressio unius est exclusio alterius* should apply, such that Congress intended to include everything else that qualifies as an employer, such as an Indian tribe. *See, e.g., San Manuel Indian Bingo & Casino v. NLRB (San Manuel II)*, 475 F.3d 1306, 1316 (D.C.Cir.2007).

operated off the reservation, on the other hand, the Board applied a three-factor test established by the Supreme Court in *Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 115–18, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), as narrowed by the Ninth Circuit in *Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113, 1115–16 (9th Cir.1985). Under the *Tuscarora–Coeur d'Alene* analysis, statutes of general applicability that are silent on the issue of applicability to Indian tribes—like the NLRA—will apply to tribal enterprises unless one of the three following exceptions applies:

> (1) [T]he law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations."

*Sac & Fox, Indus., Ltd.,* 307 N.L.R.B. 241, 244 (1992).

In *San Manuel I,* 341 N.L.R.B. 1055, and *Yukon Kuskokwim Health Corp.,* 341 N.L.R.B. 1075 (2004), the Board adopted the current, slightly revised approach to the *Tuscarora–Coeur d'Alene* analysis.[7] Under this approach, the Board determines whether it has jurisdiction based on a case-by-case analysis, regardless of the tribal enterprise's location. *See San Manuel I,* 341 N.L.R.B. at 1059 ("Indeed, there is nothing in [s]ection 2(2) to suggest that the exemption for 'employer' turns on where the entity is located."). Specifically, the Board will assert jurisdiction unless (1) the federal Indian policy requires that the Board decline jurisdiction, or (2) policy considerations militate against the assertion of the Board's discretionary jurisdiction. *Id.* at 1059–63. The Board contin-

ues to apply the *Tuscarora–Coeur d'Alene* analysis under the first prong. *See id.* at 1060–61.

In light of all of the above, to decide whether the NLRA applies to Respondent in this subpoena enforcement proceeding, the Court must consider the three aforementioned exceptions: (1) whether use of the NLRA would "touch exclusive self-governance rights in purely intramural matters," (2) whether applying the NLRA would abrogate treaty rights, and (3) whether Congress intended the NLRA not to apply to Indian tribes. *See Coeur d'Alene,* 751 F.2d at 1116; *see also NLRB v. Chapa De Indian Health Pgm., Inc.,* 316 F.3d 995, 996–97, 999 (9th Cir.2003).

First, as far as this proceeding is concerned, applying the NLRA to Respondent's business would not "touch exclusive rights of self-governance in purely intramural matters." "Purely intramural matters" generally involve "tribal membership, inheritance rules, and domestic relations." *See id.* at 1116. Courts have held that "Tribe-run" business enterprises, such as a "Tribe-owned" casino, acting in interstate commerce do not fall under the "self-governance" exception. *San Manuel I,* 341 N.L.R.B. at 1063 (citing *Fla. Paraplegic Ass'n v. Miccosukee Tribe of Indians of Fla.,* 166 F.3d 1126, 1129 (11th Cir.1999)).

Respondent nevertheless argues that its business is an "intramural matter" because its casino revenues are used to support tribal governmental programs. There is no dispute that Respondent's tribal government programs—such as its youth programs, elderly assistance programs, emergency services, or health care services—are intramural matters. But, as noted in *San Manuel I,* to infer that the means by which Respondent generates its revenue to

---

**7.** In 2007, the D.C. Circuit upheld *San Manuel I,* and the San Manuel Band did not seek

Supreme Court review. *See San Manuel II,* 475 F.3d at 1306, 1318–19.

support such services constitute "purely intramural matters" under *Coeur d'Alene* would swallow the *Tuscarora* analysis. *See id.* More importantly, the Board's subpoena does not touch Respondent's right to self-governance in an intramural matters, given that the subpoena merely seeks information regarding Respondent's effects on interstate commerce, affiliation of customers and employees, treaties, and other information directly related to Indian tribal discretionary issues.

In a broader sense, in order to determine whether application of the NLRA would impede Respondent's right of self-governance in a purely intramural matter, the Board, and possibly a future court, will need to consider the very evidence Respondent is seeking to withhold.[8] Information concerning the nature of the casino's business, the composition of its workforce, and revenues and sales is central to assessing this exception. *See Chapa De Indian Health Pgm., Inc.,* 316 F.3d at 1000 (considering such facts in determining that application of the NLRA to a tribal housing authority would not affect a purely intramural matter affecting self-governance). Thus, application of this exception is not appropriate at this time.

Turning to the second exception, Respondent argues that applying the NLRA to the Band would abrogate its treaty rights to govern its own employment relationships, to exclude nonmembers, and to manage its own economic resources. Respondent does not identify a particular treaty provision at risk of abrogation, but asserts that application of the NLRA will abrogate its inherent sovereign rights. (Resp't's Resp. to Order to Show Cause at 14–26; Docket No. 7). In Respondent's surreply, it concedes it has not made a full record concerning its treaties. (Resp't's

Surreply at 3; Docket No. 13.) To succeed under the treaty-abrogation exception, however, Respondent must identify the particular treaty rights at risk, explain how the relevant provisions should be construed, and describe how application of the NLRA would impermissibly restrict those rights. *See Solis v. Matheson,* 563 F.3d 425, 434–35 (9th Cir.2009). Although Respondent attached numerous treaties as exhibits, it did not identify particular provisions, explain their construction, or describe the NLRA's probable effect.

To properly assess the second exception in this case, the Court has to know, at minimum, whether a particular treaty provision expressly permits the Band to create a system to enforce employment rights or expressly refers to terms of employment. *See id.* at 435; *see also Reich,* 4 F.3d 490, 494 (7th Cir.1993) (in a subpoena enforcement action, finding that no treaty right governed the employment issue at hand); *Smart v. State Farm Ins. Co.,* 868 F.2d 929, 934 (7th Cir.1989) (where a tribe failed to identify a specific treaty provision at risk, finding ERISA would not abrogate treaty rights). On the present record, the Court cannot conclude that application of the NLRA would abrogate the Band's treaty rights.

Lastly, regarding the third exception, nothing in the NLRA's legislative history suggests that Congress intended to foreclosure the Board from asserting jurisdiction over Indian tribes. *San Manuel I,* 341 N.L.R.B. at 1058 (citing *Chapa De Indian Health Program, Inc.,* 316 F.3d at 1002 (affirming order enforcing Board subpoena, based on conclusion that jurisdiction was not plainly lacking)). In fact, although minimal, there is legislative history suggesting that Congress intended to

---

**8.** In this regard, the subpoena served by the Board is comparable to a request for jurisdictional discovery. Indeed, two areas for which information is requested in the subpoena are federal jurisdiction and tribal sovereignty.

include Indian tribes within the NLRA's reach. In 1999, both Houses of Congress passed amendments to the Indian Self–Determination Act ("ISDA") of 1975 that, in pertinent part, would have excluded "an Indian tribe carrying out activities authorized by the ISDA" from the NLRA's definition of "employer." *Id.* Before final passage of the amendments in 2000, the House of Representatives dropped this exclusionary language. *Id.*

Because application of the *Tuscarora–Coeur d'Alene* standard poses no impediment to the assertion of the Board's jurisdiction, the final step in this Court's analysis is to determine whether policy considerations militate against the assertion of the Board's discretionary jurisdiction in the present subpoena enforcement proceeding. The purpose of this analysis is to weigh the Board's interests in effectuating federal labor policy against the Indian tribe's interests in maintaining autonomy. *See id.* at 1062. The Board noted in *San Manuel I* that its interest in effectuating the NLRA's policies is likely to be lower when a tribe engages in traditional tribal functions that involve non-Indians, as such endeavors generally are less likely to substantially affect interstate commerce. *See id.* at 1063. Here, the Board's interests in effectuating federal labor policy outweigh Respondent's, as only a subpoena enforcement action is at issue. The Board's subpoena requests information directly related to whether Respondent's business "substantially affects" interstate commerce. Although Respondent's response includes figures regarding the general demographics of its employees, it does not include its customers' demographics or its gross annual revenues. Thus, because no administrative

record has been completely developed, the Board should be given the chance to investigate these matters, among others, to establish whether coverage under the NLRA exists. *See Shaw,* 668 F.2d at 989.

Although the revised *Tuscarora–Coeur d'Alene* analysis is complete, the Court's inquiry is not at an end. Both the *San Manuel II* court and *San Manuel I* dissent acknowledged that the *Tuscarora–Coeur d'Alene* analysis is in tension with the longstanding canons of construction that "(1) ambiguities in a federal statute must be resolved in favor of Indians, and (2) a clear expression of congressional intent is necessary before a court may construe a federal statute so as to impair tribal sovereignty." *San Manuel II,* 475 F.3d at 1311 (citations omitted).[9] Respondent does not rely on the first canon to support its argument that the NLRA is inapplicable to its business, only the second.

*EEOC v. Fond du Lac Heavy Equipment & Construction Co.,* 986 F.2d 246 (8th Cir.1993), clarified the clear-congressional-intent canon in the Eighth Circuit. "[The] general rule in *Tuscarora* ... does not apply when the interest sought to be affected is a specific right reserved to the Indians.... Specific Indian rights will not be deemed to have been abrogated or limited absent a 'clear and plain' congressional intent." *Id.* at 247 (citing *United States v. Dion,* 476 U.S. 734, 738, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986)). The Eighth Circuit explained further, "areas traditionally left to tribal self-government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms apply-

**9.** The D.C. Circuit also noted that *"Tuscarora's* statement is of uncertain significance, and possibly dictum, given the particulars of that case. Unlike the NLRA, the Federal Power Act at issue in *Tuscarora* included a specific limitation on eminent domain on Indian reservations." *Id.* at 1311 (citing *Tuscarora,* 362 U.S. at 107, 80 S.Ct. 543).

ing to all persons, includes Indians and their property interests." *Id.* (citing *United States v. White,* 508 F.2d 453, 455 (8th Cir.1974)).

The precise question at issue in *Fond du Lac* was whether the ADEA applies to Indian tribes. *Id.* at 248–50. The court ultimately concluded that the ADEA did not apply because the age discrimination dispute involved a "strictly internal matter" and neither the ADEA nor its legislative history indicated a clear and plain congressional intent to apply the ADEA to Indian tribes. *Id.* at 250.

Respondent urges the Court to apply *Fond du Lac* to this case and determine that the Band is not subject to the NLRA. This Court will not do so, however, because *Fond du Lac* is substantively and procedurally distinguishable. Procedurally, *Fond du Lac* was not a pre-complaint subpoena enforcement action but a fully litigated case decided on the merits. Here, the Board's subpoena merely requests information related to whether Respondent's business "substantially affects" interstate commerce. If the developed record later reveals that the dispute at issue does not involve a strictly internal matter, especially if Respondent substantially affects interstate commerce because, among other things, its customers are nonmembers, then a court will have to decide whether the NLRA should apply to the underlying merits of the case. *Cf. San Manuel II,* 475 F.3d at 1315 ("Second, the vast majority of the Casino's employees and customers are not members of the Tribe, and they live off the reservation. For these reasons, the Tribe is not simply engaged in internal governance of its territory and members."). Substantively, *Fond du Lac* addressed the ADEA, not the NLRA, and the two statutes are not similar in scope, language, purpose, or enforceability.

Moreover, as Respondent concedes, the Supreme Court has never explicitly overruled *Tuscarora. See San Manuel I,* 341 N.L.R.B. at 1061 ("[A]bsent the [Supreme] Court's acknowledgment that *Tuscarora* is no longer good law, the Board is bound to follow it."); *see also id.* at 1064 n. 18 (citing *Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.")). Nor are *Tuscarora–Coeur d'Alene* and *Fond du Lac* necessarily incompatible. *See, e.g., Prescott v. Little Six, Inc.,* 284 F.Supp.2d 1224 (D.Minn.2003) (holding ERISA applied to a tribal casino employer in part because the casino's alleged conduct had extramural effects and the casino failed to show how applying ERISA would affect the tribal community's inherent right of self-government), *rev'd on other grounds,* 387 F.3d 753 (8th Cir.2004).

Based on all the above, the Court finds *Tuscarora–Coeur d'Alene* the appropriate standard to apply, not *Fond du Lac.* Under that standard and given the policy considerations militating in favor of the Board asserting its discretionary jurisdiction, the Board issued its subpoena pursuant to lawful authority.

### 2. Lawfulness of Purpose, Relevance, and Reasonableness

The three remaining requirements for enforcing the administrative subpoena are that the subpoena is for a lawful purpose, requests information relevant to the lawful purpose, and requests information that is reasonable. *See McDonnell Douglas Corp.,* 751 F.2d at 226. Neither party discusses these requirements at length, and all three favor enforcement.

First, an investigative subpoena may properly seek evidence regarding all issues under investigation, including potential defenses. *See NLRB v. North Bay Plumbing*, 102 F.3d 1005, 1008 (9th Cir. 1996). Here, the Board's subpoena is for a lawful purpose, since its purpose is to investigate Respondent's affects on commerce, to establish federal jurisdiction, to analyze Respondent's characterization as a tribal sovereign, and to determine whether the Board will consider Respondent an "employer" within the meaning of the NLRA. *See* 29 U.S.C. §§ 153(d), 159(c)(1), 160(a). Second, courts have noted that for purposes of an administrative subpoena, "the notion of relevancy is a broad one.... So long as the material requested 'touches a matter under investigation,' an administrative subpoena will survive a challenge that the material is not relevant." *See, e.g., Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Board*, 878 F.2d 875, 882 (5th Cir.1989) (citations omitted). Thus, the information requested by the Board is relevant to a lawful purpose. Finally, the information is not unreasonable because the Board will use the information to decide whether to proceed with the Union's petition regarding its allegation that Respondent engaged in unfair labor practices under the NLRA. *See* 29 U.S.C. §§ 159(c), 160(b).

## III. CONCLUSION

Although Respondent possesses sovereign immunity, such immunity is not absolute. The Board can bring a subpoena enforcement action against Respondent because the action is brought by an agent of the United States. The Board issued the subpoena pursuant to lawful authority and for a lawful purpose, requested information relevant to the lawful purpose, and did not demand unreasonable information. Accordingly, the subpoena should be enforced.

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. The Board's Application for an Order Requiring Obedience to Subpoena Duces Tecum (Docket No. 1) be **GRANTED**; and

2. Respondent be ordered to appear before an agent of the Board at a time, date, and location to be set by the Board; to produce the subpoenaed documents; and to testify and answer any and all questions relevant to the matters in question in the proceedings before the Board.

Dated this 29th day of May, 2009.